## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ROEY SEGEV,<br><br>   *Plaintiff*,<br><br>   *v.*<br><br>DELTA AIR LINES, INC.<br><br>   *Defendant*. | **COMPLAINT AND<br>JURY DEMAND**<br><br>CASE NUMBER 24-7838 |

Roey Segev, by and through his undersigned attorneys in collaboration with the National Jewish Advocacy Center, Inc., complaints and alleges the following against Delta Air Lines, Inc. ("Delta"):

## **PARTIES**

1. Plaintiff Roey Segev is an employee of Defendant residing in Sunny Isles Beach, Florida.

2. Delta is a publicly owned corporation organized under the laws of the state of Delaware and has its principal place of business at 1030 Delta Boulevard, Atlanta, Georgia 30354, employing over 100,000 employees. Delta transacted and continues to transact business in New York and within Queens County by employing persons at John F. Kennedy International Airport ("JFK") and LaGuardia Airport, and conducting business within Queens County, New York. Delta has at all relevant times been an "employer" covered by Title VII, NYLL §740, the NYSHRL, and the NYCHRL.

## JURISDICTION AND VENUE

3. Jurisdiction is founded upon 28 U.S.C. § 1331 and principles of supplemental jurisdiction under 28 U.S.C. §1367.

4. Plaintiff filed a Charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") and received a Right to Sue letter dated August 13, 2024. Accordingly, Plaintiff is required to file Title VII claims by November 11, 2024, and this lawsuit is indisputably timely.

5. Plaintiff did not file with the New York State Division or City Commission, and accordingly jurisdiction for NYCHRL claims rests with this Court pursuant to the New York City Admin. Code §8-502(a).

6. Within ten (10) days of commencing this lawsuit, Plaintiff shall serve true and correct copies of this Complaint upon designated representatives for the New York City Commission on Human Rights and Corporation Counsel pursuant to New York City Admin. Code §8-502(c).

7. The New York City Human Rights Law claims herein were filed within three years of the alleged unlawful discriminatory practice and/or harassment.

8. Venue is proper in this district pursuant to 28 U.S.C. §1391(b) because Defendant is subject to the court's personal jurisdiction within the Eastern District of New York with respect to this action.

## EXHAUSTION OF FEDERAL ADMINISTRATIVE REMEDIES

9. Plaintiff has alleged claims of discrimination and retaliation pursuant to Title VII with the EEOC.

10. Plaintiff has received his Notice of Right to Sue letter from the EEOC regarding his complaints of discrimination/retaliation for the alleged Title VII claims herein within ninety (90) days of the filing of this Complaint.

## NATURE OF ACTION

11. At all times relevant hereto, Plaintiff performed the duties of his employment in a satisfactory manner.

12. Defendant has engaged in a pattern of intentionally discriminating and retaliating against ethnically Jewish and/or Israeli employees based upon their race and ancestry, including Plaintiff.

13. In the instant case, Defendant has also intentionally retaliated against Plaintiff because he engaged in protected whistleblower activities.

14. Upon information and belief, at all pertinent times, Defendant acted or failed to act by and through its duly authorized agents, servants, representatives, partners, managers, supervisors and employees, who conducted themselves within the scope and course of their employment, with intentional malice and/or with reckless disregard to Plaintiff's federal, New York State and New York City statutory rights.

## THE FACTS

**1. Background**

15. Plaintiff is a flight attendant of Jewish and ethnic Israeli background and began working for Delta on or about March 5, 2019.

16. Delta has a hub at JFK in New York City, which is the home base to which Plaintiff has been assigned since the onset of his employment. Plaintiff's supervisors and managers are based at JFK as well.

17. Plaintiff is employed by Delta as a bilingual Hebrew and English-speaking flight attendant. In that capacity, Plaintiff is required to speak with Hebrew and English-speaking passengers in their respective native languages and to converse and engage with them as part of providing good customer service.

18. Up until about January 2023, Plaintiff was happy with his workplace environment and Defendant had never complained to Plaintiff about his job performance.

2. **Plaintiff Reported Anti-Semitism**

19. On or about January 27, 2023, Plaintiff and another Jewish Israeli flight attendant, Sharon Lavy, sent an email to Defendant together to report that Jerry King, the purser responsible for managing the cabin on a round-trip flight from JFK to Tel Aviv on or about January 13, 2023 and from Tel Aviv to JFK on or about January 15, 2023, was demonstrably antisemitic to Plaintiff and other Jewish Israeli flight attendants and passengers.

20. More specifically, Plaintiff reported that Mr. King was rude and abrupt with Jewish and Israeli passengers and that the passengers complained to Plaintiff in Hebrew that Mr. King was extremely "cut and dry" with them.

21. In addition, Plaintiff reported that Mr. King referred to Jewish and Israeli passengers as "your people" when discussing them with Plaintiff and other Jewish and Israeli flight attendants.

22. Plaintiff further reported that Mr. King criticized him for taking time to speak Hebrew with Hebrew-speaking passengers rather than prioritizing fast cabin service despite the fact that Plaintiff is required to take time to engage with Hebrew speaking passengers in his role as a bilingual flight attendant.

23. Plaintiff informed Defendant that Mr. King retaliated against him for taking time to engage with passengers in Hebrew by not allowing him to take his scheduled break with Ms. Lavy, as they had both requested and had always done in the past without any issues.

24. Plaintiff reported that when he asked Mr. King why he and Ms. Lavy were suddenly not permitted to take their break together, Mr. King merely replied, "because I said so" without providing any kind of reasonable justification.

25. In this same email that Plaintiff and Ms. Lavy sent to Defendant on or about January 27, 2023, Plaintiff reported another antisemitic incident that occurred on another round-trip flight from JFK to Tel Aviv in which a flight attendant, Mary Brombosz, yelled and became hysterical with Plaintiff and Ms. Lavy on or about January 17, 2023. Plaintiff explained that Ms. Brombosz was angry that he and Ms. Lavy did not assist her with certain tasks despite the fact that such tasks were her own responsibility. Although Plaintiff and Ms. Lavy did their best to assist Ms. Brombosz, they needed to ensure that they first fulfilled their own responsibilities and they were therefore not able to assist Ms. Brombosz as much as she had requested.

26. Plaintiff further reported that on the return flight from Tel Aviv to New York, Ms. Brombosz yelled at yet another Jewish flight attendant as well as Jewish passengers.

27. Upon information and belief, Ms. Brombosz did not yell at any members of the crew or passengers that were not Jewish and only demanded that her Jewish colleagues shirk their own responsibilities to assist her and proceeded to shout at them when they refused.

28. Defendant never provided Plaintiff with any sort of response, via email or otherwise, regarding his concerns and complaints about Mr. King or Ms. Brombosz's antisemitic treatment.

### 3. Plaintiff Reported That Defendant Violated Safety Protocols

29. On or about May 31, 2023, Plaintiff witnessed an unruly aggressive passenger physically assault a Jewish Israeli flight attendant, Barak Keisar, on Delta flight 235 from Tel Aviv to JFK. Plaintiff and another Jewish Israeli flight attendant were left to attend to the violent passenger until landing. Upon landing at JFK, Plaintiff and the rest of the crew were met by base managers. Plaintiff reported the incident to his base manager in person and also submitted a report of the incident via Defendant's safety management system application, SafetyNet, on or about June 1, 2023.

30. On or about August 3, 2023, Defendant requested that Plaintiff attend a virtual meeting via Zoom to answer questions regarding the above-mentioned incident on Delta flight 235. Members of the FBI, the office of the District Attorney, and Defendant's legal counsel were present. Plaintiff was asked to provide a statement on the incident, and he stated that Defendant failed to adhere to its own policy of making an emergency landing at the nearest airport and that Plaintiff and another Jewish Israeli flight attendant's safety were put at risk by having to attend to the unruly passenger.

31. Defendant has never provided Plaintiff with any explanation as to why it deviated from Delta and the FAA's rule and policy requiring that an emergency landing be made in situations where a passenger becomes unruly.

32. On or about July 19, 2023, via Defendant's internal employee messaging platform, Plaintiff reported an unsafe cabin environment on flight 555 from Las Vegas to Atlanta. Plaintiff explained that the aircraft sat idle on the tarmac for over two hours in extreme heat (approximately 115 degrees Fahrenheit) and that Defendant violated various rules and policies by not permitting the crew and passengers to exit the aircraft under such hazardous conditions.

33. As a result, several passengers and crew members required and received medical attention from first responders and others who had fainted were transported to a local hospital.

34. Plaintiff further reported that at or around 8:00 p.m., he and the other crew members proceeded to the hotel where Defendant advised that it had made reservations for them to spend the night so that they could rest before they were scheduled to work on the rebooked flight at or about 8:00 a.m. the following morning. However, upon their arrival at the hotel, Plaintiff and the other crew members learned that Defendant had not in fact made reservations.

35. Plaintiff and the other crew members waited at the hotel for nearly five hours until approximately 2:00 a.m., at which time Defendant informed them that it has secured their reservations. It was only at or around 2:00 a.m. that Defendant informed Plaintiff and the other crew members that they would be replaced on the rebooked flight that was scheduled to depart about six hours later at 8:00 a.m.

36. Via Delta's internal messaging platform, Plaintiff complained to Defendant that it ought to have timely alerted him that he would be replaced earlier because flight attendants are entitled to have sufficient time to rest between flights according to FAA regulations and Delta's own policy. Plaintiff was understandably anxious when he thought that he would need to work on another flight without being able to properly rest first.

37. On or about August 10, 2023, at Defendant's request, Plaintiff attended a meeting with members of Defendant to discuss the hazardous conditions aboard Flight 555. Plaintiff was the only flight attendant in attendance. During this meeting, Plaintiff again explained that Defendant had violated is own rules and procedures and told Defendant that it should ensure that it properly follow its protocols and procedures to prevent similarly unsafe reoccurrences in the future.

38. Up until this point in time, Plaintiff had never once been disciplined or criticized by Defendant for his job performance.

### 4. **Defendant Retaliated Against Plaintiff**

39. About one week later, on or about August 17, 2023, at the request of Defendant, Plaintiff attended a virtual Field Service Management meeting via Zoom with Elaine Little, a senior base manager at Delta, and Lisver Carabello, a field service manager at Delta.

40. It was only at this meeting that Plaintiff learned that he was being investigated by Defendant because of supposed issues with his job performance on two separate flights.

41. Ms. Little explained that a complaint had been lodged against Plaintiff by a fellow crew member that worked with defendant nearly six months before on or about January 17, 2023. This was the same above-mentioned flight on which Plaintiff had worked with Ms. Brombosz.

42. In addition, Ms. Little explained that a passenger had allegedly filed a complaint against Plaintiff in connection with a flight on which he had worked nearly five months before on or about February 28, 2023.

43. Plaintiff was accused of using his personal cellular device on both flights, watching videos in the last row of the cabin, failing to perform his assigned duties, and deviating from Defendant's service standards.

44. Plaintiff vehemently denied each of the allegations lodged against him and asked Ms. Little to provide him with any evidence that she had to show that he had violated any of Defendant's policies.  Neither Ms. Little nor Ms. Carabello provided Plaintiff with any such evidence or claimed to have any such evidence.

45. Plaintiff expressed his concern that it seemed as though Defendant was retaliating against him for reporting its violations by fabricating complaints against him.  Plaintiff remarked

8

that it was very odd that he was being investigated for alleged misconduct that occurred so many months before.

46. Ms. Little attempted to reassure Plaintiff that Delta does not engage in retaliation and then instructed Plaintiff not to disclose the fact of the meeting or the contents thereof to any third party.

47. About one month later, Ms. Little and Ms. Carabello again scheduled a virtual meeting with Plaintiff, which took place on or about September 19, 2023. During the meeting, Ms. Carabello told Plaintiff that another passenger had complained about him.

48. This time, Ms. Little and Ms. Carabello refused to provide Plaintiff with the flight number or flight date that was the subject of the investigation.

49. Ms. Carabello claimed that during a certain flight on which Plaintiff had worked in the past, a passenger accused him of sitting in a passenger seat, wearing headphones, and watching a movie on the in-flight entertainment system while simultaneously using his personal mobile phone to look at women in lingerie.

50. Plaintiff vehemently denied each of the allegations and added that he was shocked and extremely upset to hear of such baseless, peculiar and offensive allegations.

51. In addition, Plaintiff remarked that he had never received any criticism from Defendant until he began to report Defendant's various violations and wrongdoings and expressed his concern that Defendant was retaliating against him.

52. Ms. Carabello proceeded to show Plaintiff a video that was allegedly taken on the flight in question, which showed the back of a person sitting in a passenger seat and watching a movie. The video was taken from behind and the face of the person could not be seen.

53. Ms. Carabello asked Plaintiff if he was the person in the video and Plaintiff responded that it was definitely not him.

54. Nonetheless, Ms. Little insisted that Plaintiff watch the video three consecutive times. Each time that Ms. Carabello showed Plaintiff the video, Plaintiff expressed that he was certain that the man in the video was not him. He explained that although he saw the back of the person's head and was able to confirm that it was not him based on the person's haircut, he could not understand why the video was being shown to him when it was impossible to see the face of the person in the video, the headphones or the women in lingerie that had allegedly been the basis of the complaint.

55. Plaintiff later learned that an investigation was opened against Ms. Lavy based on the allegation that she too was using her personal mobile device on the same flight as Plaintiff. Delta managers similarly showed Ms. Lavy a video of a woman using a phone on an airplane and asked Ms. Lavy if the woman was her. Ms. Lavy similarly confirmed that she was not the woman in the video.

56. Plaintiff and Ms. Lavy later exchanged information about the videos they had been shown and based on specific details of the environment they noticed in the videos were able to determine that the respective videos had in fact been taken on *two different aircrafts* despite the fact that the respective investigations against them were based on allegations regarding misconduct that had allegedly occurred during a time that they had worked together on the same aircraft.

57. Plaintiff elected not to share these details with the Defendant because he feared that they would only prompt Defendant to fabricate further retaliatory complaints against him.

58. Upon information and belief, no similarly situated employees of Defendant (other than Ms. Lavy, who is also an Israeli Jew) were subjected to comparable investigation based upon

10

uncorroborated information or inconclusive video footage whose particulars and source Defendant refused to disclose to Plaintiff.

59. On or about October 3, 2023, Plaintiff and Ms. Lavy attended a meeting with Andrea Misserian, Director of InFlight Operations, which they had arranged for the purpose of reporting their concern that Defendant's managers were harassing them and retaliating against them.

60. Plaintiff explained that he had been working for Defendant for nearly five years and that it was only after he had reported Delta's engagement in anti-Semitism and its violation of various rules and policies that Defendant opened two investigations based on alleged incidents that had taken place on flights approximately five months and six months before, respectively. In addition, Plaintiff explained that he believed that Defendant was attempting to build a fabricated record against him so that Defendant would ultimately have a basis to fire him.

61. Ms. Misserian replied that the delay in informing Plaintiff that his job performance was under investigation constituted a service failure on behalf of Defendant's leadership team, for which she apologized. Ms. Misserian then attempted to reassure Plaintiff that Defendant was not retaliating against him.

62. Although Ms. Misserian stated that Defendant was not fabricating complaints, she suggested that one of Plaintiff's co-flight attendants may have submitted fabricated complaints against him in an attempt to discredit him.

63. Ms. Misserian then suggested that since Plaintiff had not yet been found guilty of any wrongdoing, he should simply focus on continuing to follow his own core values at work rather than trying to determine who might be trying to frame him.

64. Delta's lodging of completely unfounded and fabricated complaints against Plaintiff caused him to fear working for Delta and its New York based managers that had baselessly investigated him. Consequently, Plaintiff almost entirely stopped requesting to work on New York based Delta flights after the second time that Defendant fabricated passenger complaints against him in or around September 2023 and Defendant replaced Plaintiff with other employees that had requested to work on such flights.

65. Plaintiff has foregone income so that he can avoid a hostile work environment and prevent Delta from fabricating any further complaints against him.

**5. Defendant Jeopardized the Safety and Security of Its Jewish Employees by Knowingly Employing Hamas Supporters**

66. On or about October 7, 2024, Hamas terrorists invaded Israel and killed the greatest number of Jews since the Holocaust. Hamas brutally kidnapped over two hundred and fifty people in Israel and took them hostage in Gaza, committed mass rape and burned innocent civilians alive in Israel.

67. On or about October 17, 2023, a Jewish Israeli Delta flight attendant sent an email to Delta managers on behalf of herself and forty-four other Jewish Israeli flight attendants (the "Signatories") explaining that they felt their safety was in jeopardy because Defendant continued to employ four flight attendants who exhibited their hatred and explicit animosity towards Israel via social media, including through their avid support for Hamas and/or their derogatory remarks about the state of Israel and its citizens.

68. This email further explained that Hamas's charter openly calls for the eradication of Jews and the State of Israel and that as a result, the Signatories felt extremely unsafe working alongside supporters of Hamas.

69. Although the email did not allude to Defendant's written rules or policies, Defendant is aware that employing persons who openly support Hamas terrorists on their social media platforms is a direct violation of numerous of its written policies, including its social media policy.

70. On or about February 20, 2024, Ms. Misserian informed the Signatories that their allegations had been investigated and that "appropriate action" had been taken based on Defendant's findings. However, Ms. Misserian advised that she could not share the details of the actions that had been taken. At the time of this writing, each of the individuals that were reported for openly and proudly supporting Hamas, an entity designated by the United States Department of State as a Foreign Terrorist Organization, remain employed by Defendant.

**FIRST CLAIM**
**(Religion/National Origin Discrimination**
**Arising Under Title VII)**

71. Plaintiff incorporates by reference the preceding paragraphs as if fully stated herein.

72. This claim is premised upon Title VII of the Civil Rights Act of 1964, as amended, codified at 42 U.S.C. § 2000e, *et seq.*, which prohibits employment discrimination based on, inter alia, race, religion, and national origin.

73. At all relevant times, Plaintiff was an "employee" under Title VII, 42 U.S.C. § 2000e(f).

74. Delta is an "employer" under Title VII, 42 U.S.C. § 2000e(b).

75. Delta has been engaged in and intends to engage in a pattern of discrimination against Jewish and Israeli employees.

76. Delta has been sued recently regarding its treatment of Jewish and Israeli employees and is in further receipt of multiple complaints regarding such treatment.

77. Upon information and belief, Delta discriminated against Plaintiff when Delta, inter alia, imposed disparate treatment, harassed and otherwise treated Plaintiff unfavorably as compared to similarly situated, nonprotected class coworkers subject to the same supervisor(s), manager(s), procedures and rules.

78. Delta ignored and failed to respond to Plaintiff's reports of the antisemitic treatment he endured from Mr. King and Ms. Brombosz.

79. Upon information and belief, Delta has responded to complaints of discrimination from Plaintiff's non-Jewish counterparts.

80. Delta left Jewish flight attendants to attend an unruly passenger and violated FAA regulations and own its policies and protocols by failing to divert the aircraft to the nearest airport. Upon information and belief, Delta has diverted flights and made emergency landings when non-Jewish flight attendants were put in danger by unruly passengers.

81. Delta knowingly employs Hamas supporters that openly call for the eradication of all Jews and the destruction of the state of Israel. Upon information and belief, Delta does not knowingly employ any other individuals that call for the eradication of any other ethnic or racial group that Delta employs.

82. As a direct and proximate result of Defendant's discriminatory actions, Plaintiff suffered emotional distress, inconvenience, humiliation, and embarrassment. The psychological and emotional consequences of the Defendant's actions continue to date, and, upon information and belief, will continue into the future.

**SECOND CLAIM**
**(Religion/National Origin Discrimination Arising
Under the New York City Human Rights Law)**

83. Plaintiff incorporates by reference all preceding paragraphs as if re-alleged and stated fully herein.

84. New York City Human Rights Law, N.Y. City Admin. Code § 8-101, *et seq.*, prohibits disparate treatment because of a person's national origin, including their ancestry.

85. Plaintiff is a "person" under §8-102(1) of the New York City Human Rights Law.

86. Delta is an "employer" for purposes of the New York City Human Rights Law under New York City Administrative Code § 8-102(5).

87. Defendant's discriminatory and disparate treatment of Plaintiff because he is Jewish and Israeli created a hostile work environment in violation of the NYCHRL.

88. Delta discriminated against, treated disparately, harassed, and otherwise treated Plaintiff unfavorably as compared to similarly situated, nonprotected class coworkers subject to the same supervisor(s), manager(s), procedures and rules, by, inter alia, (1) ignoring and failing to respond to Plaintiff's complaints regarding the antisemitic treatment he endured from Mr. King and Ms. Brombosz , (2) failing to divert flight 235 in accordance with Delta protocols and FAA regulations or offer any explanation as to why it violated such protocols and regulations, and (3) employing flight attendants that openly call for the eradication and destruction of Jewish people and the state of Israel.

89. Defendant's actions were done intentionally or with reckless indifference to Plaintiffs statutorily protected New York City rights.

90. As a direct and proximate result of Defendant's actions, Plaintiff suffered emotional distress, inconvenience, humiliation, and embarrassment. The psychological and emotional

consequences of Defendant's actions continue to date, and, upon information and belief, will continue into the future.

## THIRD CLAIM
**(Retaliation for Protected Activity Arising Under Title VII)**

91. Plaintiff incorporates by reference all preceding paragraphs as if re-alleged and stated fully herein.

92. This claim is premised upon Title VII of the Civil Rights Act of 1964, as amended, codified at 42 U.S.C. § 2000e, which prohibits employers from taking materially adverse employment actions in response to an employee's participation in a protected activity, including but not limited to an employee's opposition to an action taken by its employer, which the employee considers to be discriminatory.

93. At all relevant times, Plaintiff was an "employee" under Title VII, 42 U.S.C. §2000e(f).

94. Delta is an "employer" under Title VII, 42 U.S.C. § 2000e(b).

95. Plaintiff opposed Delta's unlawful, discriminatory employment practices and engaged in protected activity under Title VII.

96. Defendant's retaliatory treatment of Plaintiff because of his protected activity in advancing his Title VII rights was in violation of, inter alia, Title VII, 42 U.S.C. § 2000e-3.

97. Delta retaliated against, harassed, and otherwise treated Plaintiff unfavorably as compared to similarly situated, nonprotected class coworkers subject to the same supervisor(s), manager(s), procedures and rules, by, inter alia fabricating complaints and initiating bad-faith investigations against Plaintiff in retaliation for his reports of antisemitic treatment during the course of his employment at Delta.

98. Delta's subjection of Plaintiff to such adverse and unfavorable employment actions in retaliation for his protected activity caused Plaintiff to fear working for Delta's New York based leadership and management. Consequently, Plaintiff has very seldomly bid to work on New York based Delta flights since the second time that Delta fabricated passenger complaints against him in or around September 2023.

99. Defendant's actions were done intentionally or with reckless indifference to Plaintiff's federally protected Title VII rights.

100. As a direct and proximate result of Defendant's actions, Plaintiff suffered financial consequences, emotional distress, inconvenience, humiliation, and embarrassment. The psychological, emotional and financial consequences of the Defendant's actions continue to date, and, upon information and belief, will continue into the future.

## FOURTH CLAIM
### (Protected Activity Retaliation Arising Under the New York City Human Rights Law)

101. All preceding paragraphs are incorporated by reference as if fully stated herein.

102. New York City Human Rights Law, N.Y. City Admin. Code § 8-101, *et seq.*, prohibits retaliation because of an employee's protected activity.

103. Plaintiff is a "person" under §8-102(1) of the New York City Human Rights Law.

104. Delta is an "employer" for purposes of the New York City Human Rights Law under New York City Administrative Code § 8-102(5).

105. Defendant's retaliatory treatment of Plaintiff because of his protected activity as an employee advancing his NYCHRL rights was in violation of, inter alia, New York City Human Rights Law, § 8-107.

106. Delta discriminated and retaliated against, treated disparately, harassed, and otherwise treated Plaintiff unfavorably as compared to similarly situated, nonprotected class coworkers subject to the same supervisor(s), manager(s), procedures and rules, by, inter alia, retaliating against and harassing Plaintiff. Delta began to harass and retaliate against Plaintiff by lodging unfounded complaints against in response to Plaintiff's reports that Delta had engaged in anti-Semitism.

107. Delta's subjection of Plaintiff to such adverse employment actions in retaliation for his protected activity caused Plaintiff to fear working for Delta and consequently, Plaintiff has seldomly bid to work on New York based Delta flights since Defendant fabricated passenger complaints about him in or around September 2023.

108. Upon information and belief, Delta's actions were done intentionally or with reckless indifference to Plaintiff's statutorily protected New York City rights, entitling him to punitive damages under the New York City Human Rights Law.

109. As a direct and proximate result of intentional and/or reckless Defendant's actions, Plaintiff suffered emotional distress, inconvenience, humiliation, and embarrassment. The psychological, emotional and economic consequences of the Defendant's actions continue to date, and, upon information and belief, will continue into the future.

### FIFTH CLAIM
### (Whistleblower Retaliation
### Arising Under N.Y. Labor Law, § 740)

110. All preceding paragraphs are incorporated by reference as if fully stated herein.

111. At all relevant times, Plaintiff was an "employee" under NYLL § 740 (a).

112. Delta is an "employer" under NYLL § 740 (b).

113. Delta violated N.Y. Labor Law, § 740 by retaliating against Plaintiff for disclosing information to a supervisor and to a public body that Delta engaged in activities that Plaintiff reasonably believed were in violation of law, rule or regulation, which Plaintiff reasonably believed posed a substantial and specific danger to public health and safety.

114. Plaintiff reported to the FBI, the District Attorney's office and its supervisors that Defendant failed to make an emergency landing when an unruly passenger posed a safety risk to those onboard and that if Delta continued to flagrantly violate such applicable regulations and procedures, it would endanger public safety again in the future.

115. Plaintiff also reported to its supervisors that Delta violated a law, rule or regulation when Delta failed to allow its crew and passengers to exit an aircraft for approximately two hours when cabin temperatures had reached dangerous temperatures, which put the health and safety of the crew and passengers at risk.

116. Following Plaintiff's engagement in the above-mentioned whistleblower activities, Delta retaliated against Plaintiff by lodging completely unfounded complaints against him, which in turn caused Plaintiff to fear working for Delta.

117. As a direct and proximate result of intentional and/or reckless Defendant's actions, Plaintiff suffered emotional distress, inconvenience, humiliation, and embarrassment. The psychological, emotional and economic consequences of the Defendant's actions continue to date, and, upon information and belief, will continue into the future.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests the following relief jointly and severally as against all of the Defendant:

1. Award compensatory damages in an amount to be determined at trial:

2. Award punitive damages in an amount to be determined at trial:

3. Disbursements, costs and attorneys' fees; and

4. For such other further relief to this Court may seem just and proper.

## JURY DEMAND

Plaintiff demands trial by jury with respect to all matters amenable thereto.

DHILLON LAW GROUP, INC.
A CALIFORNIA PROFESSIONAL CORPORATION

By: _____
         Ronald D. Coleman

50 Park Place, Suite 1105
Newark, NJ 07102
973-298-1723
rcoleman@dhillonlaw.com

Lauren Israelovitch  (*admission pending*)
NATIONAL JEWISH ADVOCACY CENTER, INC.
666 Harless Place
West Hempstead, NY 11552
914-222-3828
lauren@njaclaw.org
*Attorneys for Plaintiff Roey Segev*